GAUDIN, Judge.
Mrs. Elizabeth Doran slipped and fell in the Clearview Supermarket in Metairie, Louisiana. A civil jury in the 24th Judicial District Court set damages at $315,725.00 and assigned negligence thusly: Mrs. Do-ran, seven per cent; Clearview Supermarket, 73 per cent; and Jani-King, a janitorial service, 20 per cent. Mrs. Doran’s husband, Luke, was awarded $10,000.00 for loss of consortium. The supermarket appealed.
Prior to trial in September, 1988, the Dorans and Jani-King had entered into a compromise settlement and this defendant was dismissed by court order.
On appeal, Clearview contends that it was not negligent and that the awards to Mr. and Mrs. Doran were improper. Also, appellant argues that the trial court erred in denying the supermarket’s claim for indemnity from Jani-King.
For the following reasons, we affirm the various assessments of negligence and we affirm the award to Mrs. Doran. The award to Mr. Doran was not supported by any meaningful evidence and it is set aside. We also void any judgment regarding indemnity as Jani-King was dismissed from the district court proceedings, did not take part in the trial and is not now before this Court on appeal.
THE ACCIDENT
Mrs. Doran was 29 years of age when she testified at trial in 1988. She said that on May 10, 1985, at approximately 8 a.m., she went to Clearview Supermarket to purchase diapers for her daughter. At that time, William Ford, Jani-King’s franchise owner, and a helper were waxing and polishing the supermarket’s terrazzo floor, a chore performed, according to contract, once a month.
Ford testified that he had placed pyramid-type caution signs throughout the store. The signs, Ford said, were four or five feet high but they were not put in the center of any aisle “... because I never blocked any of the aisles ... I wasn’t permitted to block the aisles so people couldn’t come in ... I did not want to hinder the business.”
The signs, Ford stated, were always in plain view of the manager and other supermarket employees. Ford testified that he was never instructed to totally block off an aisle being waxed or polished. In any event, Mrs. Doran said that when she entered the store and proceeded down an aisle, she did not see any caution signs. She was in the process of walking past a display rack in the center of an aisle when she slipped and fell. She said:
“When I fell, I hit this Daiquiri rack, which is in the middle of this short aisle
“I walked and I fell, I was in a sitting position. I had fallen on my buttocks
“When I got up ... a customer there, a little old lady there, she helped me up. And she was pulling my dress down. My dress was damp. It was moist.”
Ford said that waxing and polishing of the area where Mrs. Doran fell had been completed 15 or 20 minutes before the accident. Ford stated that he didn’t know if the floor at that spot had dried. Asked if he looked at the floor after Mrs. Doran fell, Ford said: “No, I did not.”
*963 Brian Duhe, a supermarket stock boy, said that Jani-King people were working in the area where and when Mrs. Doran fell. Duhe also remembered that the floor was what he called “wet.”
Mrs. Doran explained that because of her prior back surgeries, she was cautious and would have noticed a warning sign had one been there. She said:
“... if I fall I am going to hurt myself in some kind of a way. So, I try — if I walked somewhere, and it is wet, and I am going inside, I always wipe my feet because I don’t want to fall, I don’t want to have to go through surgery again. I don’t want to do anything that is going to make me go through something that is painful, that is very uncomfortable, and it’s a nightmare. So, if there was a sign there, I would have never walked through that place because I don’t think I am dumb enough to do that to myself, and put myself in jeopardy after nine months post-op when everything is starting to look great for me, to walk somewhere where it is dangerous for me.”
No doubt the jury was convinced that a foreign or unexpected substance on the floor caused Mrs. Doran to slip. Once this was established, the burden shifted to the supermarket to exculpate itself from negligence by showing that it had discharged its duty in recognizing and correcting a dangerous condition reasonably anticipated in the course of business. See Brown v. Winn Dixie Louisiana, Inc., 452 So.2d 685 (La.1984), and Cascio v. Continental Casualty Company, 547 So.2d 743 (La.App. 4 Cir.1989).
The instant jury in answers to interrogatories submitted to it, found both Clearview and Jani-King negligent, likely because the floors were being waxed and polished during regular business hours and/or because the wet, slippery areas were not effectively closed to customer traffic. The jury could have decided that the caution signs were negligently positioned. Regardless, the record supports the findings of negligence and a finding that neither defendant had proved that it had- discharged a duty owed to Mrs. Doran.
In allotting the percentage of negligence under LSA-C.C. art. 2323, the jurors had wide discretion under the facts and circumstances of this case. They found Mrs. Doran seven per cent negligent although the record would support a finding of no negligence or a higher degree of negligence on her part. Likewise, the percentage of negligence attributed to Clear-view and Jani-King could have been different; however, the negligence attributed— 73 per cent to the supermarket and 20 per cent to the janitorial service — was within the jury’s discretion and not clearly erroneous. It is plausible that the jurors found Clearview more responsible because the supermarket had ownership and supervisory control over when and how the waxing and polishing would be done.
MRS. DORAN’S INJURIES
Prior to May 10, 1985, Mrs. Doran had back problems and was in a sensitive, vulnerable position when she fell in the supermarket. As a result of an automobile accident in 1981, she had had two back operations. She had a lumbar spinal fusion on May 27, 1982, in which her own bone was used for the graft; and on August 28, 1984, Mrs. Doran underwent an anterior lumbar fusion with bone taken from a bone bank. Two discs were removed.
Dr. Henry LaRocca, an orthopedic surgeon who performed both operations, testified that although both grafts were in place in May, 1985 and that Mrs. Doran was no longer experiencing back muscle spasms, the healing process from the August, 1984 surgery was not complete. The healing process, Dr. LaRocca said, takes about 18 months and that Mrs. Doran, in May, 1985, was “... in a situation of vulnerability.”
When Dr. LaRocca saw Mrs. Doran on May 13, 1985, he found spasm in her back and tenderness and he said that Mrs. Do-ran was in “... a lot more pain.” Eventually Dr. LaRocca recommended that steel spinal plates be inserted in Mrs. Doran’s back to relieve what he called “... bone grinding on bone.” Dr. LaRocca stated:
*964 “... as time went by, after May, she continued to have a good deal of pain. She picked up the use of a pain pill back to four or five times a day. And had on x-ray definite evidence that the 4-5, L-4-5 fusion, did not unite.”
Mrs. Doran initially chose not to submit to further surgery, saying she didn’t want a surgical implant placed in her back. She added that she rejected another operation “... because I have been through it twice. I know what it is about. It’s a nightmare for me. It’s a nightmare for my children. And it’s a big burden for my husband because somebody has to care for me. I am very scared of it because naturally you are taking a risk. They could damage your nerves. Anything could happen when you go under major back surgery.”
Nonetheless, Mrs. Doran testified at trial that she now realized more surgery is necessary. She said:
“I don’t want to get anything in my back. But I can’t live the way I am living ... I have to have something done to myself if I want to be able to do the things that a normal mother does ... “... I have no alternative but to go through this again, and to have these stuck into my back.”
From Mrs. Doran’s viewpoint, Dr. La-Rocca provided the jury with several paramount observations. First, he said that Mrs. Doran was definitely hurting and that further surgery (at a cost of between $20,-000.00 and $25,000.00) and treatment were essential. Also, he related Mrs. Doran’s present complaints and deteriorated back condition to the supermarket accident.
Under cross examination, Dr. LaRocca was asked: “It (the fall) aggravated her condition such as she needs another surgery, is that what you are telling the jury?” The response: “Well, that the situation her back was in, falling would aggravate it, sure.”
Dr. Raeburn Llewellyn, a neurosurgeon, saw Mrs. Doran on November 10, 1986. Dr. Llewellyn stated that he was impressed by Mrs. Doran’s uncomfortableness. He said: “I felt that she had ongoing mechanical problems in her low back that were a source of pain. And I felt that she needed an additional operative procedure.”
Dr. Llewellyn was asked this question: “Doctor, because of the history of (her) fall, and the marked increase in pain, and newness of muscle spasm in the lower lumbar areas, your opinion and diagnosis is that she had a lumbar herniated disc somewhere in her lower back related to this May fall, is that correct? ” Dr. Llewellyn answered: “Yes ... that was my opinion after this office examination.” He recommended further tests to confirm his opinion.
As medical witnesses, the defense called Drs. Robert Applebaum, Jeffery Karas and Chester Scrignar and occupational therapist Susan Smith. Ms. Smith testified that when she saw Mrs. Doran on September 11, 1985, she (Mrs. Doran) did not say anything about her May 10, 1985 fall in the supermarket.
Dr. Applebaum, a neurological surgeon, saw Mrs. Doran on December 5, 1986. Dr. Applebaum said that his examination showed “... some minimal mechanical and some equivocal neurological findings.” However, Dr. Applebaum stated that from his neurological point of view, there was no indication for further surgery.
Under cross examination, Dr. Applebaum admitted that Mrs. Doran’s supermarket fall could have caused increased neck pain.
Dr. Karas, a chiropractor, examined Mrs. Doran on July 19, 1985 at the request of Mrs. Doran’s counsel. Mrs. Doran told Dr. Karas that the May 10, 1985 fall irritated her back; however, Dr. Karas said that Mrs. Doran related her back problems to the 1981 automobile accident.
Dr. Scrignar, a psychiatrist, saw Mrs. Doran on four occasions, the first time on July 12, 1985. Dr. Scrignar said that Mrs. Doran blamed her emotional problems on the 1981 automobile accident, not on the supermarket slip and fall.
Despite several contradictions in the medical presentation, the jury obviously favored Dr. LaRocca’s testimony and found that additional surgery, involving surgical implants, would be necessitated and that this further treatment was brought on by *965 the supermarket fall. The record supports this finding.
Appellants, citing Coleman v. Douglas Public Service, Inc., 423 So.2d 1205 (La.App. 4 Cir.1982), Gallardo v. New Orleans Steamboat Co., 459 So.2d 1215 (La.App. 4 Cir.1984), and several other cases, argue that $50,000.00 is the highest reasonable amount the jury could have awarded Mrs. Doran for aggravation of a preexisting back injury. Mrs. Doran’s aggravation, however, was of a very serious nature and, according to Drs. LaRocca and Llewellyn, would require additional expensive surgery involving substantial pain and disability. We cannot say the award was beyond the jury’s discretion.
OTHER ISSUES
We turn now to the award to Mr. Doran for loss of consortium, which is the conjugal fellowship of husband and wife and which includes, in addition to sexual relations, the right of each to the company and affection of the other. While there was some testimony about Mr. Doran being inconvenienced, there was an insufficiency of direct proof. Mr. Doran perhaps could have helped his cause but he didn’t testify.
Concerning the indemnity issue, the record shows that Jani-King was dismissed as a defendant prior to trial. Jani-King’s attorney participated in the trial only as a brief witness, saying only that Jani-King and not Clearview had hired a private investigator to do a surveillance on Mrs. Do-ran. Any indemnity adjudication by either the jury or trial judge would therefore be inappropriate.
The supermarket may well have a claim for indemnity according to terms of its janitorial services contract, but such a demand was not before the district court and is not before us now.
The record indicates that a third party demand was in fact made by Clearview on Jani-King and that Jani-King responded and issue apparently was joined. However, when the plaintiffs dismissed Jani-King as a defendant, Jani-King and its counsel vanished from the proceedings and did not defend against the third party allegations. The trial judge did not read any indemnity instructions to the jury.
If the supermarket’s third party demand is still viable, it would have to be first handled, properly and in due course, in the district court.
Finally, we note this. Clearview complains because the trial judge erred in not permitting a witness (Charles Albrest, the supermarket manager) to testify about what the janitorial services owner (Ford) allegedly had said about the cause of Mrs. Doran’s slip and fall. Ford did not testify in person; instead, his deposition was read to the jury.
If the trial judge was in error in making this procedural ruling, the mistake was harmless. Albrest did testify in person about numerous other matters while Ford’s 32-page deposition was read in open court. In it, Ford described how Mrs. Doran fell, etc.
For these reasons, we affirm the award to Mrs. Doran and the apportionment of comparative negligence. We reverse and set aside the award to Mr. Doran and the denial of Clearview’s claim for indemnity from Jani-King. We remand this matter to the district court for appropriate disposition of the third party claim for indemnity if such a demand remains pending. Clear-view is to bear costs of this appeal.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.